ODOM, Justice.
 

 In the year 1923, each of the above-named defendants sought and obtained a loan' from the Federal Land Bank of New Orleans, and, as security, mortgaged certain real estate situated in the parish of Richland.
 

 On August 11, 1930, the plaintiff bank brought separate foreclosure proceedings, via ordinaria, against the defendants, praying for judgment against each for the balance due, that its mortgage be recognized as first lien upon the property incumbered, and that it be sold and that the amount of its debt be paid out of the proceeds by preference and priority over all other claims.
 

 Each of the defendants filed exceptions of no cause of action, which were overruled. They then filed exceptions of waiver and estoppel, which, on being heard, were sustained, and plaintiff’s suit in each case was dismissed. From these judgments the plaintiff bank appealed.
 

 The defendants, appellees, answered the appeals and in this court ask that the exceptions of no cause of action be considered and sustained. As the three cases involve questions, both of law and fact, almost if not quite identical, the cases were consolidated in the lower court and were heard together here.
 

 We shall first consider and pass upon the exceptions of no cause of action, because, if those exceptions are well founded, the cases are at an end, and the other exceptions need not be considered.
 

 On Exception of No Cause of Action.
 

 The mortgages involved are for specified amounts payable in thirty-five fixed annual installments, according to amortization tables adopted by the Federal Farm Loan Board.
 

 They contain the following pertinent clauses:
 

 
 *632
 
 (1) The usual pact de non alienando clause, with the additional stipulation that the mortgagors would not deteriorate the property to the prejudice of the mortgage, expressed as follows: “And the said mortgagor hereby being bound and obligated not to sell, alienate, encumber or deteriorate the property to.the prejudice of this act.”
 

 (2) “If the mortgagor should sell the land or any part thereof herein mortgaged without the consent of the Federal Land Bank given in writing, then said Federal Land Bank, its successors or assigns, may at its option, and its option only, declare the indebtedness hereby secured, due and payable.”
 

 (3) “Mortgagors will take good care of said real estate, will not commit waste or allow waste to be committed on same, but will cause the same to be worked and cultivated in a proper and farmerlike manner, at all times, and will not cut or remove any timber or improvements from the said land, except such as may be needed for mortgagor’s ordinary farm purposes; and further, will keep the houses, fences, ditches and other improvements on said land in good condition and repair at all times.”
 

 (4) “In the event of said note, or any installment thereon, not being promptly paid at maturity, or in the event of failure to comply with any of the obligations herein undertaken, said note shall ipso facto and at once mature and become due and payable, anything therein contained to the contrary notwithstanding ; and it shall be lawful for, and the mortgagor hereby authorizes the then holder or holders of this note, without making demand or putting in default * * * to cause all and singular the property herein mortgaged and hereinabove described, to be seized and sold, after due process of law.”
 

 Plaintiff’s petition in each of the cases affirmatively sets out, and the documents annexed thereto show, that the defendants, at the time the suits were filed, were not in default on their payments; that they had paid all annual installments and interest due in exact accordance with the terms and stipulations contained in the notes and mortgages.
 

 The notes not being due and all installments thereon having been paid, plaintiff’s petition sets out no cause of action, unless, as it alleges, it had the right to accelerate the maturity of the notes and declare them due and payable, under the terms of the mortgage.
 

 Plaintiff alleged that, for specific causes fully set out in its petition, it had the right, under the plain stipulations contained in the mortgage contract, to declare the mortgage notes due and payable, and that it had accordingly done so. As reasons why it had the right to declare the notes due and payable in advance of their maturity dates, plaintiff alleged, in substance, that, subsequent to the dates on which the mortgages were given, each of the defendants had granted oil and gas leases on the property mortgaged^ with rights in the lessees to go upon the property and make use of it for development purposes ; that the lessees or their assigns had explored the land for oil and gas by drilling several wells, and had brought in natural gas in paying quantities, which they had been for some time and were then extracting from the land; that the extraction of natural gas from the land constituted “waste,” as that term was meant and used in the mortgage contract; that the granting of mineral leases
 
 *634
 
 on the property was a permit to the lessees to commit waste on the property, all in violation of the obligations assumed by the mortgagors that they would “take good care of the said real estate and will not commit waste, or allow waste to be committed on same.”
 

 Plaintiff further alleged that the defendant Mulhern, without its knowledge or consent, had sold the mortgaged land in fee; that the defendant Sartor, without its knowledge or consent, had placed one or more second mortgages on the property, which mortgages had been foreclosed and the property sold.
 

 It is alleged that the extraction of gas from the mortgaged property is a deterioration thereof to plaintiff’s prejudice, that the value of the land has been, and is constantly being, diminished by the extraction of the gas therefrom, and that drilling activities interfere with the use of the surface of the land for farming purposes, and generally that the security for the loans made to defendants has been, and is constantly being, weakened.
 

 The rule that all allegations in a petition or complaint setting forth facts, and not mere conclusions of the pleader, are to be accepted as true for the purpose of determining whether a cause of action is disclosed, is too well settled to need citation of authority to support it. The questions then to be determined are whether these defendants have violated the obligations which they assumed in the mortgage contracts,' and, if so, whether those violations are of such character as to warrant plaintiff’s action in declaring the unpaid balance of the mortgage indebtedness due and payable.
 

 Whether defendants have violated their obligations to plaintiff must be determined by considering the mortgage contracts as a whole in connection with what they did as disclosed by the petition. Able counsel for defendants argue that plaintiff’s petitions do not show a violation of any obligation assumed by the mortgagors.
 

 In order to secure their indebtedness to plaintiff, these defendants mortgaged their property in its favor. They granted to their creditor a right over their property for the security of its debt. C. O. art. 3278. Mortgage being a species of pledge (O. O. art. 3279), the property mortgaged was bound for the payment of the debts. Mortgage is a real right on the property bound for the discharge of the obligation. “It is in its nature indivisible and prevails over all the immovables subjected to it, and over each and every portion.” O. O. art. 3282. The property bound was the land, which includes everything on and beneath its surface. While the owner of land does not own the fugitive minerals, such as oil and gas, beneath its surface, but only
 
 the
 
 right to reduce them to possession and ownership, and while such minerals are not susceptible of ownership apart from the land (Frost-Johnson Lbr. Co. v. Salling’s Heirs, 150 La. 756, 91 So. 207, on second rehearing, page 855 of 150 La., 91 So. 242, reaffirmed in numerous recent eases), yet those minerals, while in place in the ground beneath the surface, unsevered, are real estate, a part of the land itself, a part of the realty, as much so as timber, coal, iron, and salt. 12 R. C. L., heading “Gas,” p. 864, and authorities cited under note 4; 18 R. O. L., heading “Mines,” p. 1206, and authorities cited under note 18; 27 Cyc., heading “Mines and Minerals,” p. 629, and cases cited under note 16; 40 G. J., head
 
 *636
 
 ing “Mines and Minerals,” p. 904, § 422, and cases cited under note 80.
 

 A lease granted by the owner of land for the development of the property for oil and gas is, in a sense, a conveyance of the mineral rights, an alienation of a part of his interest in the land, a dismemberment of the realty. Shaw v. Watson, 151 La. 893, 92 So. 375.
 

 The gas in place in the ground being a part or element of the realty, it follows that it constitutes a part of the value of the land, and it, like the surface of the realty, was pledged by the mortgagors to the mortgagee as security for the debt. By giving the mortgage, the mortgagors granted to the mortgagee a right, a species of pledge, over not only the surface of the land, but over all its constituent elements, including the gas in place and unsevered.
 

 These mortgagors, without the mortgagee’s consent, leased the property mortgaged for oil and gas development subsequent to the date of the mortgage. The leases were permits or authorizations to the lessees to mine for and extract from the land all of the oil and gas beneath the surface and thereby reduce it to possession and ownership. The lessees, in the exercise of their rights under the leases, drilled, brought in gas, and for a period of almost a year prior to the date on which these suits were filed had been and were then extracting gas from the lands and disposing of it in the markets, although plaintiff had no knowledge of the sales until about five months before suits were filed. This they were doing under permits granted by the mortgagors.
 

 The result was that the fee was impaired, the value of the realty was diminished to the extent of the value of the gas reduced to possession, and the mortgagee’s security weakened. The realty mortgaged was thereby deteriorated to the prejudice of the mortgagee’s rights in violation of one of the stipulations in the
 
 mortgage,
 
 whereby they bound and obligated themselves not to deteriorate the property mortgaged to the prejudice of the mortgage.
 

 These oil and gas leases were in the nature of servitudes on the property for the extraction of the gas, and, while the mere establishment of them on the realty did not necessarily depreciate the value of the estate, the exercise of or use of them necssarily had that effeet.
 

 Article 750 of the Civil Code reads in part as follows:
 

 “An estate being mortgaged does not prevent the owner from establishing servitudes on it, saving always to the creditor the right of demanding his debt, if the establishment of the servitude evidently depreciates the value of the estate.”
 

 The withdrawal of gas from the lands not only deteriorated them, but was a waste of them as the term “waste” was meant in the act of mortgage.
 

 In Thornton’s “Law of Oil and Gas” (3d Ed.) § 388, it is stated that the mortgagor of gas, oil, or mining lands may remove the minerals and convert them into money if the gas or oil wells or mine operated were dug or opened at the time the mortgage was made, “but if they were not, then the lands can not be so worked, for it is waste against the mortgagee to permit it, even though the land was purchased as mineral land.”
 

 
 *638
 
 In 40 Cyc. p. 506, the following text is found:
 

 “As a general rule, it is regarded as waste to open new mines or quarries upon demised premises and take rock, oil, minerals, etc., therefrom, unless the lease expressly includes the right to take minerals, rock,” etc.
 

 In “Washburn on Real Property” (4th Ed.) p. 108, it is stated:
 

 “Waste, in short, may be defined to be whatever does lasting damage to the freehold or inheritance, and tends to the permanent loss of the owner in fee, or to destroy or lessen the value of the inheritance. Any act which tends to diminish the estate and cause a permanent loss to the owner of the fee constitutes waste.” Aldridge v. Houston Oil Co., 116 Okl. 281, 224 P. 782; Breeding v. Ritterhoff, 126 Okl. 225, 259 P. 227; Dangerfield v. Caldwell (C. C. A.) 151 F. 554; Williamson v. Jones, 43 W. Va. 562, 27 S. E. 411, 38 L. R. A. 694, 64 Am. St. Rep. 891; Rupel v. Ohio Oil Co., 176 Ind. 4, 95 N. E. 225, Ann. Cas. 1913E, 836; Cosgriff v. Dewey, 164 N. Y. 1, 58 N. E. 1, 79 Am. St. Rep. 620; Fawn Lake Ranch Co. v. Cumbow, 102 Neb. 288, 167 N. W. 75.
 

 Counsel for the mortgagors argue that the taking of gas from the lands was not such waste as the parties to the act contemplated. In this connection they call attention to the entire clause in which “waste” is mentioned and also to the fact that the purpose of making such loans is to enable the borrower either to acquire or improve property for a home. Following that part of the general clause with reference to “waste” is the clause, “but will cause the same to be worked and cultivated in a proper and farmer-like manner at all times and will not cut or remove timber or improvements from the said land,” etc.
 

 They argue that the only kind of waste contemplated was such as might be committed on the surface of the land, such as the permitting of the land to wash away, removing timber, and allowing the buildings to fall into ruin from neglect. The whole clause includes not only such waste as the removal of timber and improvements, but more. It refers to any kind of waste, and the removal of the minerals from land is as much a waste of it as the removal of timber. The fact that the removal of minerals was not mentioned is immaterial. If the morgagors had permitted their neighbors to cart away the top soil or a manufacturer to take clay for the manufacture of brick or tile, no one would doubt that they were permitting waste, although the removal of soil or clay is not referred to as a “waste” of the property. The minerals in place in the ground are as much a part of the realty as the soil or the clay.
 

 Counsel for the mortgagors argue that the granting of the mineral leases was, in effect, a sale of the minerals or a sale of part of their ownership of the land, and in support of the argument on this point they cite Shaw v. Watson, supra. Their contention then is that the removal of gas from the land, which the plaintiff alleges is or was “waste,” was permissible under the sale, and that, inasmuch as the sale was not a violation of the contract under the pact de non alienando clause (Bank v. Miller, 44 La. Ann, 199, 10 So. 779), they were guilty of no breach of their contract, conceding that the extraction of the gas was a waste of the land.
 

 
 *640
 
 This argument overlooks the fact that the so-called pact de non alienando clause in the mortgages is more than a pact against the sale of the property. The parties obligated themselves not to sell it to the prejudice of the mortgage. That is the pact de non alienando, and, as counsel say, its only effect was to permit the mortgagee to proceed directly against the mortgagors for the collection of their debt without notice to those who may have subsequently acquired it. But they not only bound themselves not to sell the property, but that they would not “deteriorate or incumber” it to the prejudice,of the mortgage. This is not part of the pact de non alienando proper, but a separate and additional obligation.
 

 The act of mortgage contains the stipulation that, “in event of failure to comply with any of the obligations herein undertaken, said note shall ipso facto, and at once, mature and become due and payable.”
 

 These mortgagors failed to comply with their obligations to prevent deterioration and waste of the realty, for which reason plaintiff, under the above clause, was within its rights in declaring the balance due on the mortgage due and payable, from which it follows that the exception of no cause of action was properly overruled.
 

 On Exception of Waiver and Estoppel.
 

 The basis of this exception is that plaintiff, through its proper agents and officers, had knowledge of the granting of the leases, of all drilling operations under them, and of the •discovery and bringing in of gas, these operations covering a period of nearly four years prior to the filing of the suits. During this entire time, plaintiff had demanded and accepted payment of each annual installment of the mortgages, some of the payments having been made while gas was being sold, although the record discloses that it had no knowledge of the sales until April, 1930, five months before suit was filed. Furthermore, plaintiff -did not discourage, but rather encouraged, these drilling operations, and on one or more occasions granted additional time for making payments. Plaintiff did not at any time indicate to either the landowners or the lessees that it was displeased on account of the leasing or drilling operations or that it would attempt to foreclose because of them, but did object to removal and conversion of the gas.
 

 Now the landowners and the lessees, who intervened in these suits and joined the defendants in resisting the foreclosure proceedings, say that plaintiff’s conduct, its apparent acquiescence in these mining operations, and its acceptance of the installments due on the mortgage, lulled them into a false sense of security and misled them into a position which has resulted in hurt and injury to them.- The interveners alleged and proved that they had spent thousands of dollars in developing the lands for minerals, which expenditure they say they would not have made had they known that plaintiff intended to foreclose.
 

 They contend that, even if it be conceded that the mortgagors did violate their obligations by granting mineral leases on the land, thereby permitting the deterioration and waste, and if it be further conceded that such violations, if violations they were, gave plaintiff the right under the acceleration clause of
 
 *642
 
 the mortgage to declare the balance on the mortgages due and payable and to foreclose, it waived that right by accepting payments on their mortgages as above stated. They co'n-tend that plaintiff is legally and equitably estopped by its conduct and course of dealing.
 

 Plaintiff’s answer is that it did not in fact mislead the defendants; that defendants and their lessees knew all along that, whereas it did not, because it could not, object to the leasing of the lands for mineral development nor to the drilling operations, yet it would and did object to the abstraction of minerals from the lands without payment of its mortgage.
 

 Plaintiff kept in close touch with . operations in the gas field through O. C. Norman, secretary-treasurer of the local Farm Loan Association, of which defendants .were members. Drilling operations were begun as early as June, 1926, and by December, 1929, wells had been drilled on each of the tracts, to the knowledge of plaintiff. No gas was actually taken from any of the wells until December, 1929, about eight months prior to the filing of these suits on August 11, 1930, but knowledge of this fact was not brought to plaintiff until April, 1930.
 

 These contracts of mortgage did not prohibit the leasing of the lands for minerals, nor is there any stipulation in them which can be construed as a prohibition against drilling operations unless it was apparent that such operations would or did result in deterioration or waste of the land. The prohibition was against waste or deterioration. The drilling for oil or gas, per se, does not constitute waste or a deterioration of the realty. But, when production is reached and gas and oil are abstracted and reduced to possession and ownership, the fee is diminished and impaired to the extent of the value of the gas or oil abstracted and used. The use of the gas or oil extracted is a “conversion of the fee pro tanto, or, as expressed at common law, waste,” which was prohibited under these ’ mortgages. Aldridge v. Houston Oil Co., supra; Breeding v. Ritterhoff, supra.
 

 Plaintiff, therefore, had no cause of action until December, 1929, when production began. This, of course, was known to the attorneys for defendants and their lessees.
 

 There is nothing in the record to show that plaintiff at. any time agreed to waive its right to declare the balance on the mortgage due and payable, and nothing it did can be reasonably construed to mean that it intended to do' so. The installments Which defendants paid were due and had to be paid under the pain of foreclosure. The acceptance of the installments which were admittedly due did not create a waiver of .plaintiff’s right to protect its interest because.-of a breach of the contract which had not then and might not later, take place. It is pointed out that plaintiff accepted, in one of two instances, payment of installments after gas was being withdrawn from the wells or after the breach complained of occurred, and in one instance after suit was filed. But there was no controversy over these amounts. They were due and paid voluntarily.
 

 The cause of these actions was a breach of the contract not relating to defaults in pay
 
 *644
 
 ments, but to a breach relating to waste and deterioration. The acceptance of these amounts, which were admittedly due and voluntarily paid, did not estop plaintiff from asserting a right given it for a breach of the contract on another ground. Union Trust Co. v. New Jersey Water & Light Co., 93 N. J. Eq. 562, 117 A. 155; also Id., 94 N. J. Eq. 446, 120 A. 329; Mechanics’ Realty- Co. v. Leva, 16 Ga. App. 7, 84 S. E. 222; Fay v. Picariello, 109 Misc. 662, 180 N. Y. S. 621; Henry Rose Merc. Co. v. Smith, 139 La. 217, 71 So. 487; Saxton v. Para Rubber Co., 166 La. 308, 117 So. 235.
 

 None of the payments were made with the understanding, implied or express, that they should operate to defeat plaintiff’s right to foreclose on the ground of waste and deterioration.
 

 Erjtoppels are not favored in law and .should not be permitted to defeat the administration of law and cannot be sustained on argument or by inference. Hornor v. McDonald, 52 La. Ann. 396, 27 So. 91; Herber v. Thompson, 46 La. Ann. 186, 14 So. 504.
 

 But, aside "from this, the record discloses to our satisfaction that defendants and their lessees knew that plaintiff would not permit the withdrawal of gas from the wells without payment of their mortgages. Mr. Norman, secretary-treasurer of the Farm Loan Association of which defendants were members, and who was on the ground and in touch with defendants, was so notified by letter. On January 26, 1927, the plaintiff wrote to the Louisiana Petroleum Company, which was the lessee of two of the tracts, stating in part:
 

 “We write of course to remind you that the Federal Land Bank is the holder of a first mortgage on these properties and as such can not permit the removal and sale of the minerals from the properties without satisfactory arrangements having been made with the bank, unless of course, our loans are paid off in full.”
 

 On March 8th the petroleum company wrote the bank in answer to its letter of January 25th, stating that the company was drilling on the land “you mentioned, trying to make a commercial gas well, but up to the present time we do not have a commercial well, therefore unable to sell any gas from same. However, if we do get gas in paying quantities, we will get in touch with you and see how we can handle same, or if you will please write us how you do in such cases where there is production from minerals where you hold a mortgage.”
 

 Two days later, the bank replied that it. felt certain “that the executive committee will desire our loans paid in full, before any minerals are removed.”
 

 For the reasons assigned, the judgment, overruling the exceptions of no cause of action, is affirmed, and that sustaining the exceptions of waiver and estoppel filed by defendants and the interveners is reversed and set aside. It is ordered that the cases be reinstated on the docket of the Fifth district court, there to be proceeded with according to law and the views herein expressed, this opinion and decree to apply in each of the cases.
 

 ST. PAUL, J., absent